| | |
|---|---|
| BETTY JANE AYERS,<br>DAVID RUSSELL AYERS, and<br>SARAH WALKER BRUUN,<br><br>    Plaintiffs,<br><br>v.<br><br>TRE HARGETT,<br>MARK STEPHENS,<br>GEN. JONATHAN THOMAS SKRMETTI,<br>JANET M. KLEINFELTER,<br>DAVID KUSTOFF,<br>JIM COOPER,<br>STEVE COHEN,<br>MARSHA BLACKBURN, and<br>BILL HAGERTY,<br><br>    Defendants. | No.: 3:22-CV-370-TAV-JEM |

## MEMORANDUM OPINION

Before the Court is defendants Tre Hargett, General Jonathan Thomas Skrmetti, and Janet M. Kleinfelter's (the "State Defendants") motion to dismiss [Doc. 4] and defendants David Kustoff, Jim Cooper, Steve Cohen, Marsha Blackburn, and Bill Hagerty's (the "Federal Defendants") motion to dismiss [Doc. 13]. Both the State Defendants and the Federal Defendants move the Court to dismiss plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6). Defendant Mark Stephens ("Stephens") has filed a motion requesting to join-in and adopt by reference the State Defendants' motion to dismiss [Doc. 12]. Plaintiffs have responded to these motions [Doc. 19], and this matter is now ripe for the Court's review. *See* E.D. Tenn. L.R. 7.1(a), 7.2. For the reasons

explained below, Stephens's motion [Doc. 12] will be **GRANTED**, defendants'[1] motions [Docs. 4, 13] will be **GRANTED**, and this case will be **DISMISSED**.

I.      Background

On or about September 20, 2022, plaintiffs, proceeding *pro se*, filed this action in the Anderson County Circuit Court, and on October 19, 2022, the Federal Defendants filed a notice of removal to federal court [Docs. 1, 1-1]. Plaintiffs' *pro se* complaint is, respectfully, difficult for the Court to comprehend. As the Court reads the complaint, plaintiffs are residents and registered voters of the State of Tennessee [Doc. 1-1, p. 18]. They allege that defendants have failed to discontinue the use of electronic voting machines that are "easily able to be accessed" and "votes switched" [*Id.* at 7–8]. In addition, plaintiffs assert that defendants failed "to send the vote back to the States to be re-certified on January 6, 2021, [] which was an act of treason in light of the content of the evidence they were given, as they allowed a man they knew We the People had not elected to be sworn in as President" [*Id.* at 8]. Plaintiffs demand that defendants "immediately resign and face prosecution under the law, or contact this Court for a date of hearing on this matter" [*Id.*].

Plaintiffs maintain that "we the people, as individual members of the public have standing as citizens and taxpayers under common law" and "have this right of redress per the U.S. Constitution," citing the first paragraph of the U.S. Constitution [*Id.*]. Plaintiffs

---

[1] "Defendants" refers collectively to the State Defendants, the Federal Defendants, and Stephens.

also quote Article I, Sections 1, 2, 4, and 5 of the Tennessee Constitution [*Id.* at 9]. They state that venue is proper in this Court under Article I, Section 5 and Article IV, Section 1, Paragraph 2 of the Tennessee Constitution and the Fourteenth Amendment to the U.S. Constitution, the Elections Clause, Article I, Section 4, Clause 1 [*Id.* at 11].

In plaintiffs' statement of the claim, plaintiffs assert that "the methods by which elections at the local, state, and [f]ederal levels in Tennessee were conducted in 2020 and are being conducted in 2022 cannot be shown to provide the fair elections guaranteed to every citizen under the U.S. and Tennessee Constitutions, per the 14th Amendment to the U.S. Constitution, the Elections Clause (Art. I, § 4, cl. 1), Art. I, § 5, and Article IV, § 1, ¶ 2 of the Tennessee Constitution" [*Id.* at 13]. Plaintiffs contend that "[a] cryptographic security risk inherent in all voting machines by design, a Trapdoor mechanism [] makes the output of votes shown in reported election results impossible to reconcile with the ballot inputs, except under a full visual inspection and re-count of all paper ballots cast" [*Id.*].

Plaintiffs explain that "Tennessee's voting systems possess the capability to be accessed by the internet" and "our votes switched" [*Id.* at 14]. They contend that "the machines used in Hamilton County, Tennessee, are Dominion ImageCast machines, like those used in Mesa County, Colorado" [*Id.* at 15]. Plaintiffs also maintain that they "can find no EAC certification for Anderson County's voting machines in any minutes/reports of the State Election Commission Meetings," and they feel "Anderson County machines and possibly many others throughout the state are and have not been EAC certified per HAVA law in 2018, 2020, or for the upcoming elections" [*Id.* at 16]. Plaintiffs allege that

3

"[g]iven the number of machines in use in Tennessee, it is highly likely that some were either connected to the Internet or transmitted data that manipulated votes, denying some in Tennessee our right of suffrage per Article 1, § 5 of the Tennessee Constitution" [*Id.*].

Plaintiffs urge that "[t]he probability of changing the votes after the machines read the ballots or have votes punched in is too high to leave such a critical part of the foundation of the United States, free and fair elections, to the intentions of foreign and domestic bad actors who would sway election results at all levels, local, state, and [f]ederal" [*Id.* at 16–17]. Plaintiffs argue that retention of the November 2020 election data is critical to verifying the 2020 election results and ensuring the fairness of all future elections [*Id.* at 17]. In addition, they argue that "[u]ntil an in-person, paper ballot, day-of-election voting process is re-established, with results reported immediately after the voting period ends, Americans cannot have any level of confidence that the reported results of any elections accurately reflect the votes cast" [*Id.*]. Plaintiffs state that before and during the November 2020 election, neither of the two Voting System Testing Laboratories typically accredited by the Election Assistance Commission had current unexpired accreditations, and as a result, there could be no such approval of Tennessee's voting systems for the November 2020 election [*Id.* at 18]. Plaintiffs then cite and quote meeting minutes, reports, and memoranda addressing the issue of voting machines in Tennessee [*Id.* at 22–26].

Plaintiffs quote Amendment XIV, Section 3 of the U.S. Constitution to argue that defendants have violated their oaths to uphold the state and federal constitutions [*Id.* at 28–29]. Plaintiffs maintain that by utilizing voting machines subject to "the Trapdoor

4

mechanism," Tennessee has deprived its voters of the capability of knowing that their votes were accurately counted [*Id.* at 30]. As relief, plaintiffs demand "a full forensic audit and investigation of Tennessee's November 2020 election results, data and electronic machines, and additionally demand an immediate order for the preservation of all 2020 election data and records" [*Id.* at 31]. Plaintiffs argue that irreparable harm will be suffered if these records are destroyed, as there will be no way to prove the integrity of their votes [*Id.*]. Plaintiffs also demand "an emergency temporary/permanent injunction restraining order against the use of any electronic voting equipment or method in the State of Tennessee until this investigation is complete" [*Id.* at 31–32]. They further demand that all future elections be conducted using the paper ballot method, that the results of every county in Tennessee for the 2020 elections be retabulated, and that the Court address the lack of action taken by defendants in the face of plaintiffs' evidence [*Id.* at 32–33].[2]

## II. Standard of Review

Defendants have brought motions to dismiss under Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) permits a party to seek dismissal based on a lack of subject matter jurisdiction. Rule 12(b)(1) motions fall into two categories: "facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A facial attack is a challenge to the sufficiency of the pleading itself." *Id.* In considering whether jurisdiction has been established on the face of the pleading, "the court must take the material

---

[2] The Court notes that plaintiffs' complaint is lengthy and contains many duplicative allegations. However, the Court has attempted to summarize the allegations and claims to the best of its ability.

5

allegations of the [pleading] as true and construed in the light most favorable to the nonmoving party." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974)). "A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Id.* In that instance, no presumptive truthfulness applies to the complaint's factual allegations and the Court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (internal quotation marks omitted).

Here, defendants' Rule 12(b)(1) argument is properly construed as a factual attack, as they contend that the Court lacks subject matter jurisdiction because plaintiffs lack Article III standing to bring this lawsuit [Docs. 4, 12, 13]. Notably, unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), "where subject matter jurisdiction is challenged under Rule 12(b)(1)[,] . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium*, 78 F.3d at 1134 (internal quotation marks omitted). In addition, the Court is not required to presume the factual allegations contained in the complaint are true. *See id.*

Given plaintiff's *pro se* status, the Court notes that federal courts have a duty to "liberally construe the briefs of pro se litigants and apply less stringent standards to parties proceeding pro se than to parties represented by counsel." *Bouyer v. Simon*, 22 F. App'x 611, 612 (6th Cir. 2001). At the same time, however, "the lenient treatment generally accorded to pro se litigants has limits." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir.

6

1996). As such, courts have not typically "been willing to abrogate basic pleading essentials in *pro se* suits." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).

### III. Analysis

#### A. Stephens's Motion to Join-In and Adopt by Reference the State Defendants' Motion to Dismiss

The Court first addresses Stephens's motion to join-in and adopt by reference the State Defendants' motion to dismiss [Doc. 12]. Stephens states that the same allegations in the complaint that apply to the State Defendants also generally apply to him. He contends that plaintiffs' claims are generalized grievances about the voting machines and voting procedures used and are not justiciable controversies to confer federal subject matter jurisdiction. Based on Stephens's contentions, the Court finds his motion to be well-taken and made in the interest of judicial efficiency. As a result, Stephens's motion to join-in and adopt by reference the State Defendants' motion to dismiss [Doc. 12] will be **GRANTED**, and Stephens will be permitted to join-in and adopt by reference the State Defendants' motion to dismiss [Doc. 4].

#### B. Motions to Dismiss

Because there is some overlap between the State Defendants' and the Federal Defendants' motions to dismiss, the Court will analyze both motions together.

Both the State Defendants and the Federal Defendants move to dismiss plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted

7

[Docs. 4, 13].[3] Beginning with the State Defendants' motion, they argue that plaintiffs' complaint, when viewed as a whole, is nothing more than a generalized grievance and not the kind of controversy that is justiciable in federal court [Doc. 5, p. 6]. As a result, they contend this Court lacks subject matter jurisdiction over this case [*Id.*].

In support, the State Defendants assert that plaintiffs do not allege any facts establishing a concrete and particularized injury, i.e., an injury affecting plaintiffs in a personal and individual way resulting from the use of the current voting systems in Tennessee [*Id.* at 11]. Instead, plaintiffs allege that "it is highly likely that some [voting machines] were either connected to the Internet or transmitted data that manipulated votes, denying some in Tennessee our right of suffrage" and that "[b]y utilizing voting machines subject to the Trapdoor mechanism . . . Tennessee has deprived its voters of the capability of knowing that their vote was accurately counted" [*Id.* at 11–12].

However, the State Defendants argue that this injury is one that is common to all citizens of the State of Tennessee and not just plaintiffs [*Id.* at 12]. In fact, the State Defendants maintain that throughout the complaint, plaintiffs refer to themselves as representatives of "We the People," reinforcing the conclusion that they are pressing a generalized, as opposed to a personal, grievance [*Id.*]. But the State Defendants report that the U.S. Supreme Court has consistently held that a plaintiff raising only such a generally available grievance about government does not state an Article III case or controversy,

---

[3] Because the Court disposes of this case on subject matter jurisdiction grounds, the Court will not address the State Defendants' and the Federal Defendants' additional arguments.

8

citing *Lance v. Coffman*, 549 U.S. 437 (2007) [*Id.*]. As a result, the State Defendants contend that plaintiffs lack standing because they are not affected by the continued use of the current voting systems in Tennessee in any personal and individual way [*Id.* at 13]. To the contrary, the State Defendants urge that the continued use of these voting systems affects all Tennessee voters equally [*Id.*].

Turning to the Federal Defendants' motion, they similarly argue that plaintiffs lack Article III standing, as they cannot show any of the three elements required for standing [Doc. 14, p. 7]. In support, the Federal Defendants state that plaintiffs have not suffered an injury in fact [*Id.*]. Like the State Defendants, the Federal Defendants cite to *Lance v. Coffman*, 549 U.S. 437 (2007) as a U.S. Supreme Court case that decides the issue in the election context [*Id.* at 7–8]. They maintain that plaintiffs bring their complaint as "individual members of the public" and claim to have standing as "citizens and taxpayers under common law" [*Id.* at 8]. Their complaint alleges that the electronic voting machines used in the Tennessee 2020 election have the ability to be easily accessed via the internet and the potential for their votes to be switched [*Id.*].

However, the Federal Defendants argue that plaintiffs allege no evidence that their votes were actually switched but simply that their vote has the means to be disenfranchised and will continue to be in danger of such if continued use of the electronic machines is allowed [*Id.*]. The Federal Defendants contend that these overarching, broad allegations about the administration of the Tennessee election process are precisely the type of undifferentiated, generalized grievances about the conduct of government that courts have

9

refused to permit [*Id.*]. Not only is this clearly an injury common to all citizens of the State of Tennessee, but the Federal Defendants argue that plaintiffs have consistently styled themselves as representative of the people, further supporting the conclusion that their alleged injury is nothing more than an undifferentiated, general grievance [*Id.* at 8–9]. The Federal Defendants maintain that it is clear from the allegations in plaintiffs' complaint that plaintiffs themselves have not suffered a harm in any personal way, and as a result, they lack standing [*Id.* at 9]. The Federal Defendants further note that plaintiffs do not have taxpayer standing to bring their suit because they have not alleged a violation of the Establishment Clause, citing to *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 593 (2007) [*Id.*].

Plaintiffs' response is largely unresponsive to the arguments made by the State Defendants and the Federal Defendants in their respective motions to dismiss [Doc. 19]. Instead, plaintiffs utilize their response as an opportunity to restate the allegations made against defendants in their complaint [*Id.* at 1–2, 6–7, 9–10, 12, 15]. While plaintiffs cite and quote several cases, statutes, and constitutional provisions, they provide little to no explanation of how these authorities support their case [*Id.* at 4–6, 7–9, 10–13, 15–16]. They also reiterate arguments they previously made in support of their request for remand to state court [*Id.* at 3, 8, 10, 15; Doc. 3], which the Court has already addressed and denied [Doc. 18].

Plaintiffs demand that defendants resign from their positions, or that they attend a hearing within 10 days to dispute the evidence presented [Doc. 19, p. 14]. They also state

10

that a writ of quo warranto is a remedy under common law in which the burden of proof is on defendants, and plaintiffs should not have the burden of defending why this case should not be dismissed [*Id.*]. They demand for the Court to shift the burden of proof to defendants, hold a hearing,[4] order default judgment,[5] and order defendants to resign and face prosecution [*Id.* at 15].

"Article III of the Constitution gives federal courts subject matter jurisdiction over actual cases or controversies, neither of which exists unless a plaintiff establishes his standing to sue." *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012). Thus, "standing is the threshold question in every federal case." *Id.* (internal quotation marks omitted).

"Plaintiffs bear the burden of establishing standing, and they must support each element in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation." *Schickel v. Dilger*, 925 F.3d 858, 866 (6th Cir. 2019) (internal quotation marks omitted). For standing under Article III, a plaintiff must show: (1) "an injury-in-fact—a harm that is both concrete and actual or imminent, not conjectural or hypothetical," (2) "a causal connection [] between the plaintiff's injury and the alleged conduct of the

---

[4] The Court notes that because defendants' motions to dismiss can be resolved on the basis of the paper record alone and do not involve complex legal or factual questions, a hearing is not necessary in this case. *See Rutkofske v. Norman*, No. 95-2038, 1997 WL 299382, at *3 (6th Cir. June 4, 1997).

[5] Default judgment is not appropriate in this case where defendants have not "failed to plead or otherwise defend" [*See* Docs. 4, 12, 13]. Fed. R. Civ. P. 55(a).

11

defendant," and (3) "redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Davis v. Detroit Pub. Schs. Cmty. Dist.*, 835 F. App'x 18, 23 (6th Cir. 2020) (internal citations and quotation marks omitted).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). In addition, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* at 340. In the context of declaratory or injunctive relief, plaintiffs "must show a present ongoing harm or imminent future harm." *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020). Furthermore, as is particularly relevant to this case, the U.S. Supreme Court has held:

> [A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Lance*, 549 U.S. at 439 (quoting *Lujan*, 504 U.S. at 573–74).

One case particularly instructive is *Shelby Advocs.*, where an organization along with four individuals sued an assortment of state and local election officials and entities, alleging that "in future elections, the defendants will burden their right to vote, dilute their votes, and disenfranchise them in violation of the Fourteenth Amendment's Equal

12

Protection and Due Process clauses." 947 F.3d at 989. In the plaintiffs' complaint, they feared that their votes in future elections would be "denied or substantially burdened." *Id.* Specifically, the plaintiffs complained that the election workers had failed to recertify the voting machines as Tennessee requires. *Id.* at 980. In addition, they made several allegations as to the county's use of digital voting machines, including that (1) "the machines connect to the Internet [which] makes them vulnerable to hacking and cyberattacks," (2) "[t]he machines may also be hacked, [] by insertion of a memory card containing malware," (3) "the machines do not produce a paper record of each voter's choices, which [] makes them difficult to audit for voter-protection purposes, whether to confirm that the machines recorded the votes accurately at the outset or to confirm that hackers did not modify the votes afterwards," and (4) "the machines sometimes 'flip' votes, recording a vote cast for A as a vote cast for B due to programming or maintenance problems." *Id.*

The plaintiffs in *Shelby Advocs.* stated that each of these problems were partly the responsibility of the state, as "it has failed to enact standards that sufficiently protect elections from hacking and voting-machine malfunctions because it does not require all counties to use paper ballots with optical scanning, and it does not prohibit Internet-capable voting machines or prescribe rules for handling voting-machine memory cards." *Id.* The plaintiffs requested injunctive relief similar to the relief sought in this case, including preventing the use of the machines in future elections and examination into the voting machines. *Id.*

13

With respect to the issue of standing, the Sixth Circuit determined that the plaintiffs' "alleged future risk of vote dilution or vote denial stemming from maladministration and technology problems" had an imminence problem. *Id.* at 981. The court found that "[t]he complaint's allegations with respect to injury all boil down to prior system vulnerabilities, previous equipment malfunctions, and past election mistakes," and "the Supreme Court has not been sympathetic to claims that past occurrences of unlawful conduct create standing to obtain an injunction against the risk of future unlawful conduct." *Id.* (collecting cases). While the plaintiffs had alleged "vote-flipping," the court found that the plaintiffs had not alleged "that this vote-flipping ever happened to any of them or in any election in which they were candidates, and the evidence they produced indicates that 'all errors' were 'corrected prior to casting [the] ballot[s].'" *Id.*

The Sixth Circuit continued that even if "the plaintiffs had adequately alleged past harm, they have not plausibly alleged, much less shown, that future vote-flipping is 'certainly impending.'" *Id.* at 981–82 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)). "Nor, to the extent the Supreme Court has suggested the possibility that a 'substantial risk' plus mitigation costs can satisfy the imminence requirement, would that make a difference." *Id.* at 982. Thus, the court concluded that "[t]he plaintiffs have not plausibly shown that there is a substantial risk of vote flipping," and "[i]n the absence of imminent harm, the individual plaintiffs have no standing to sue and thus no basis for moving forward with their claims." *Id.*

14

Here, plaintiffs' allegations mirror those in *Shelby Advocs.*, and for that reason, they suffer from the same defects. Specifically, plaintiffs' allegations pertain to "elections at the local, state, and [f]ederal levels in Tennessee [that] were conducted in 2020" [Doc. 1-1, p. 13], indicating that any alleged injury occurred in the past. In addition, they assert that "Tennessee's voting systems *possess the capability* to be accessed by the internet" and "votes switched" [*Id.* at 14 (emphasis added)]. Plaintiffs contend that "[g]iven the number of machines in use in Tennessee, it is *highly likely* that some were either connected to the Internet or transmitted data that manipulated votes" [*Id.* at 16 (emphasis added)]. Plaintiffs further state that "[t]he *probability* of changing the votes after the machines read the ballots or have votes punched in is too high to leave such a critical part of the foundation of the United States, free and fair elections, to the intentions of foreign and domestic bad actors who *would sway* election results at all levels, local, state, and [f]ederal" [*Id.* at 16–17 (emphasis added)].

As explained by the Sixth Circuit in *Shelby Advocs.*, plaintiffs' allegations of past unlawful conduct cannot create standing to obtain an injunction against the risk of future unlawful conduct. *See* 947 F.3d at 981 (collecting cases). Even if plaintiffs adequately alleged past harm, they have not plausibly alleged, much less shown, that future vote-flipping is certainly impending or that a substantial risk exists, as they reference phrases

15

such as "possess the capability," "highly likely," and "probability" [*Id.* at 14–17].[6] *See Clapper*, 568 U.S. at 414 ("[R]espondents' speculative chain of possibilities does not establish that injury [] is certainly impending[.]").

In addition, plaintiffs have not alleged that any purported "vote-flipping" happened to them personally, as they reference that "some in Tennessee" were denied their right of suffrage without identifying who those individuals are [Doc. 1-1, p. 16]. They also continually reference "We the People" and maintain that "we the people, as individual members of the public have standing as citizens and taxpayers under common law" [*Id.* at 8]. These allegations demonstrate that plaintiffs seek to assert a right possessed by every citizen, which is "a generalized grievance that is plainly undifferentiated and common to all members of the public." *Lance*, 549 U.S. at 440–41 (internal quotation marks omitted); *see also Ayers v. Wilkinson*, No. 21-0551, 2021 WL 5992117, at *3 (D.D.C. May 10, 2021) (finding that references to the plaintiff as a representative of "We the People" throughout the complaint reinforces "the conclusion that she is pressing a generalized, as opposed to a personal, grievance"). As the U.S. Supreme Court has held,

---

[6] Throughout the complaint, plaintiffs reference evidence and exhibits regarding the existence of and the potential for vote-flipping [*See, e.g.*, Doc. 1-1, pp. 13–15, 28]. Recently, the Federal Defendants filed a notice supplementing the removal documents, which included the complaint along with several exhibits that were not originally presented to the Court when this action was removed [*See* Docs. 23, 23-1]. The Court has reviewed the exhibits attached to the complaint and finds they do not change the outcome of this case. Specifically, plaintiffs' exhibits relate to claimed widespread voting issues across the country or in places other than Anderson County, Tennessee [*See, e.g.*, Doc. 23-1, pp. 37–41, 56–59, 76, 96, 182, 325]. However, even if plaintiffs can show an imminent risk elsewhere, "that does not translate into an imminent risk that individuals will hack the voting machines in [Anderson] County, Tennessee." *Shelby Advocs.*, 947 F.3d at 983.

16

this type of generalized grievance is not sufficient for standing. *See Lance*, 549 U.S. at 442.[7]

Moreover, "the payment of taxes is generally not enough to establish standing to challenge an action taken by the Federal Government." *Hein*, 551 U.S. at 593. An exception to this rule is where a plaintiff challenges "a law authorizing the use of federal funds in a way that allegedly violates the Establishment Clause." *Id.* Here, plaintiffs have made no such challenge, so they also lack standing as taxpayers. For all these reasons, plaintiffs have failed to establish the requisite "injury-in-fact" needed for Article III standing.

As to plaintiffs' request for a writ of quo warranto, "[a] writ of quo warranto is [a] common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." *Hughes v. Martin*, No. 3:22-cv-00332, 2022 WL 1598254, at *1 (M.D. Tenn. May 19, 2022) (internal quotation marks omitted). However, "'[a] private individual lacks standing to institute a quo warranto proceeding.'" *Id.* (quoting *Allen v. Stark State Coll.*, Nos. 19-3723, 19-3975, 2020 WL 4382781, at *2 (6th Cir. June 4, 2020)).

---

[7] Plaintiffs cite case law in their complaint that stands for the proposition that everyone has a right to vote and to have their vote counted [Doc. 1-1, p. 30]. However, this right does not negate the fact that plaintiffs must allege "a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right possessed by every citizen to require that the government be administered according to law." *Baker v. Carr*, 369 U.S. 186, 208–09 (1962) (internal citations and quotation marks omitted) (finding that the plaintiffs had standing to sue where they sought relief "to protect or vindicate an interest of their own, and of those similarly situated" when a voting classification "disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties").

17

Thus, because plaintiffs are private individuals [*See* Doc. 1-1, pp. 8, 18], they lack standing to seek relief via a writ of quo warranto.

Further, many of the forms of relief requested by plaintiffs cannot be redressed by this Court. *See Love v. Vilsack*, 908 F. Supp. 2d 139, 144–45 (D.D.C. 2012) ("To satisfy th[e] element [of redressability], a plaintiff must show in the first instance that the court is capable of granting the relief sought."). First, the Court cannot order defendants to resign from their official positions or review decisions made within the discretion of their positions. *See Clapper*, 568 U.S. at 408 ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."). Similarly, "the Court lacks the authority to compel the executive branch to initiate a prosecution." *Ayers*, 2021 WL 5992117, at *3 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").[8]

Based on the foregoing, plaintiffs lack Article III standing to bring this cause of action. The Court reaches this conclusion as to plaintiffs' claims brought under federal and state law. *See Davis*, 835 F. App'x at 23 ("Federal courts must determine that a plaintiff

---

[8] Plaintiffs cite case law for the proposition that the Court can infer a private right of action for damages even when an action has not been expressly provided because "every wrong must have a remedy" [Doc. 19, pp. 11–12]. However, the Court does not reach the issue of whether plaintiffs have stated any "wrong" on the part of defendants because plaintiffs must first demonstrate that they have standing to bring this lawsuit, which they have failed to do.

has standing under Article III before considering whether a plaintiff has state-law standing."). As a result, the Court lacks subject matter jurisdiction to hear this case.

## IV. Conclusion

For the reasons explained above, Stephens's motion [Doc. 12] will be **GRANTED**, defendants' motions to dismiss [Docs. 4, 13] will be **GRANTED**, and this case will be **DISMISSED**.  A separate order shall enter.

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE